UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION**, | ) | |
| | ) | Civil Action No: |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **F9 ADVERTISING LLC**, a limited liability | ) | |
| company, | ) | **COMPLAINT** |
| | ) | |
| **ACE INITIATIVE GROUP LLC**, a limited | ) | |
| liability company, | ) | |
| | ) | |
| **CONNECTED AD STATION LLC**, a | ) | |
| limited liability company, | ) | |
| | ) | |
| **FASTLANE SALES LLC**, a limited | ) | |
| liability company, | ) | |
| | ) | |
| **HYPER MARKETING SOLUTIONS** | ) | |
| **LLC**, a limited liability company, | ) | |
| | ) | |
| **MEDIA REDEFINED LLC**, a limited | ) | |
| liability company, | ) | |
| | ) | |
| **PRIMED MARKETING LLC**, a limited | ) | |
| liability company, | ) | |
| | ) | |
| **RESPONSIVE MEDIA LLC**, a limited | ) | |
| liability company, and | ) | |
| | ) | |
| **GOPALKRISHNA PAI**, individually and as | ) | |
| an owner of F9 Advertising LLC, Ace | ) | |
| Initiative Group LLC, Connected Ad Station | ) | |
| LLC, Fastlane Sales LLC, Hyper Marketing | ) | |
| Solutions LLC, Media Redefined LLC, | ) | |
| Primed Marketing LLC, and Responsive | ) | |
| Media LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 57b, and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 4 of ROSCA, 15 U.S.C. § 8403.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345 and 15 U.S.C. §§ 57b and 8404(a).

3.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), (c)(1), and (c)(2).

## PLAINTIFF

4.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces ROSCA, 15 U.S.C. §§ 8401-8405.  ROSCA prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements for disclosure, consent, and cancellation to protect consumers.  A negative option is an offer in which the seller treats a consumer's silence—*i.e.*, their failure to reject an offer or cancel an agreement—as consent to be charged for good and services.  16 C.F.R. § 310.2(w).

5.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to remedy violations of ROSCA and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 57b, 8404.

## **DEFENDANTS**

6.     Defendant F9 Advertising LLC ("F9 Advertising") is a Puerto Rican limited liability company.  F9 Advertising's Certificate of Formation states its principal address is at 10 Palmas Drive, Humacao, Puerto Rico, 00791.  F9 Advertising transacts or has transacted business in this District and throughout the United States.

7.     Defendant Ace Initiative Group LLC ("Ace Initiative Group") is or was a Wyoming limited liability company.  Ace Initiative Group's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Ace Initiative Group transacts or has transacted business in this District and throughout the United States.

8.     Defendant Connected Ad Station LLC ("Connected Ad Station") is or was a Wyoming limited liability company.  Connected Ad Station's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Connected Ad Station transacts or has transacted business in this District and throughout the United States.

9.     Defendant Fastlane Sales LLC ("Fastlane Sales") is or was a Wyoming limited liability company.  Fastlane Sales's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Fastlane Sales transacts or has transacted business in this District and throughout the United States.

10.     Defendant Hyper Marketing Solutions LLC ("Hyper Marketing Solutions") is or was a Wyoming limited liability company.   Hyper Marketing Solutions's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834. Hyper Marketing Solutions transacts or has transacted business in this District and throughout the United States.

11.    Defendant Media Redefined LLC ("Media Redefined") is or was a Wyoming limited liability company.  Media Redefined's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Media Redefined transacts or has transacted business in this District and throughout the United States.

12.    Defendant Primed Marketing LLC ("Primed Marketing") is or was a Wyoming limited liability company.  Primed Marketing's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Primed Marketing transacts or has transacted business in this District and throughout the United States.

13.    Defendant Responsive Media LLC ("Responsive Media") is or was a Wyoming limited liability company.  Responsive Media's Articles of Organization state its principal address is 412 N. Main Street, Suite 100, Buffalo, WY 82834.  Responsive Media transacts or has transacted business in this District and throughout the United States.

14.    Defendant Gopalkrishna Pai ("Pai") is the sole owner of F9 Advertising and its President, Secretary, and Treasurer.  He also is or was the sole owner of Ace Initiative Group, Connected Ad Station, Fastlane Sales, Hyper Marketing Solutions, Media Redefined, Primed Marketing, and Responsive Media.

15.     At all times material to this Complaint, acting alone or in concert with others, Defendant Pai has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of F9 Advertising, Ace Initiative Group, Connected Ad Station, Fastlane Sales, Hyper Marketing Solutions, Media Redefined, Primed Marketing, Responsive Media, and at least one hundred other companies he has owned and controlled, including the acts and practices set forth in the Complaint.  Defendant Pai resides in this District and, in connection

with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

## COMMON ENTERPRISE

16.      Defendants F9 Advertising, Ace Initiative Group, Connected Ad Station, Fastlane Sales, Hyper Marketing Solutions, Media Redefined, Primed Marketing, and Responsive Media (collectively "Corporate Defendants") and at least one hundred other companies owned and controlled by Defendant Pai operated as a common enterprise while engaging in the deceptive acts and practices and other violations of law alleged below. Defendants conducted the business practices described below through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations, and that commingled funds.

17.      Because Corporate Defendants have operated as a common enterprise, each is jointly and severally liable for the acts and practices described below.

18.      Defendant Gopalkrishna Pai formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the common enterprise.

## COMMERCE

19.      At all times material to this Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

20.      From at least February 2016 through at least August 2017, Defendants generated revenue from selling skin care products online through negative option marketing.

21.     Defendants charged consumers a nominal trial cost without telling them they would be charged for the full cost of the product and for monthly auto-shipments unless consumers took action to cancel.

22.     Defendants touted their "Risk Free" trials as costing only nominal shipping and handling costs, typically $4.99 or less.

23.     Defendants actually charged consumers who ordered the trial more than $90 for that trial product if they did not cancel within 14 or 15 days, depending on the offer.

24.     If a consumer did not cancel within 14 or 15 days, Defendants enrolled them in autoship programs, charging them more than $90 monthly without consumers' knowledge or consent.

25.     Defendants frequently charged consumers for additional products and enrolled them in autoship programs related to these additional products without consumers' knowledge or consent.

26.     To hide their scheme, Defendants used more than 100 shell companies with straw owners to obtain merchant processing accounts ("merchant accounts") needed to accept and process consumers' credit and debit card payments.

27.     The practice of processing credit and debit card transactions through shell companies is one form of "credit card laundering."  Some merchants use credit card laundering to circumvent credit card associations' monitoring programs and avoid detection by consumers and law enforcement.

28.     Defendants brought in tens of millions of dollars through their deceptive trial offers and payment processing scheme.

**Defendants' Product Websites**

29.     At various times, Defendants sold eight skin care products through their trial-offer websites.

30.     Defendants sold Vita Luminance and Regenelift through a single website.

31.     Defendants sold Derma Vibrance and Nuevoderm through another website.

32.     Defendants sold Revived Youth Cream and Revived Youth Serum through a third website.

33.     Defendants sold Aura Youth Cream and Aura Youth Serum through yet another website.

34.     Defendants drove traffic to these websites through affiliate networks.  Affiliates in these networks provided links to Defendants' websites through traffic generators such as banner advertisements on Facebook, blog posts, and surveys.

35.     In many instances, consumers who ordered a trial skin care product did so without realizing that Defendants would charge them the full price of the trial product and enroll them in an autoship subscription program with monthly charges of more than $90.

36.     For example, a web page tied to an online sale by Defendant Ace Initiative Group urged consumers with prominent, bolded text to "CLAIM YOUR FREE TRIAL" stating "You Qualify for a Risk Free Trial."



Figure 1 (a web page for Vita Luminance).

37.     If consumers clicked the "RUSH MY TRIAL" button (*see* Figure 1), the website took them to another web page again directing them to "HURRY!" and provide their contact information in a box titled "TELL US WHERE TO SEND YOUR TRIAL TODAY!"  A "RUSH MY TRIAL" button appears at the bottom of the contact form.



Figure 2 (a web page for Vita Luminance).

38.     When consumers entered their contact information (*see* Figure 2) and clicked "RUSH MY TRIAL," the website took them to a checkout page displaying information about the $4.95 trial cost.

39.     The checkout page told consumers that their only cost would be nominal shipping costs, typically $4.95.



Figure 3 (checkout page for Vita Luminance).

40.     The checkout page (*see* Figure 3) directed consumers to enter their credit card information.  A large red arrow directed them to "CONFIRM YOUR EXCLUSIVE TRIAL NOW!"  The red arrow pointed towards a large turquoise "COMPLETE CHECKOUT" button.

41.     If consumers clicked on the "COMPLETE CHECKOUT" button on the checkout page, they incurred two obligations in addition to the $4.95 shipping and handling fee identified on the web page.

42.     First, if a consumer did not cancel the trial within 14 or 15 days of placing the order, Defendants charged them the full price, more than $90, often $97.81, for the trial product.

43.     Second, if consumers did not cancel the trial within 14 or 15 days of placing the order, Defendants enrolled them in an autoship program charging them more than $90.00, often $97.81, each month until they affirmatively cancelled.

44.     Towards the end of the checkout page, away from the prominent "COMPLETE CHECKOUT" button and other prominent text and graphics on the web page, two sentences appear in small, light-gray font placed against a white background.

45.     These sentences state, "Initially, just pay $4.95 for S&H today to fully evaluate Vita Luminance Cream for fourteen (14) days.  We know that you'll love your smooth, wrinkle free skin.  You will receive your product within 5 business days."  *See* Figure 3.

46.      Below these two sentences, a "TERMS AND CONDITIONS" hyperlink appears in small, light-gray font toward the bottom of the checkout page.  This hyperlink appears away from the prominent text and graphics on the page urging consumers to complete the checkout process. *See* Figure 3.

47.      Only by clicking on the "TERMS AND CONDITIONS" hyperlink and then scrolling through a pop-up window could consumers learn that Defendants would charge

10

consumers the full price of the product at the end of the trial period and enroll them in an autoship program with recurring charges until they cancelled.

48.    No other web page displayed during the ordering process told consumers that if they did not cancel within the trial period Defendants would: (1) charge them for the full price of the trial product and (2) enroll them in an autoship program with monthly charges.

**Upsell Offers**

49.    In numerous instances, after consumers entered their credit or debit card information and clicked on the "COMPLETE CHECKOUT" button, the websites automatically took them to a webpage that displayed the name of the initial product in the upper left corner, and informed them their order was not complete.

50.    On one of Defendants' website, for example, this webpage told consumers in bolded, red letters appearing about a third of the way from the top of the page, "WAIT! YOUR ORDER IS NOT COMPLETE."



Figure 4 (upsell web page associated with a Vita Luminance sale).

51.     A large turquoise button labeled "COMPLETE CHECKOUT" appeared about a third of way up from the bottom of this web page.  *See* Figure 4.

52.     An image that looked like a coupon for a different skin care product appeared on the web page.

53.     The webpage stated that the offer was for a "RISK-FREE TRIAL" where a consumer "just pay[s] shipping of $4.95."  Below the "COMPLETE CHECKOUT" button, a

12

hyperlink labeled "No Thanks, I decline this offer" appeared in small, light-gray font placed against a white background.   Further down, the same "Terms and Conditions" hyperlink described in Paragraphs 46-47 appeared.

54.     To many consumers, this second "COMPLETE CHECKOUT" button appeared to be a reconfirmation of consumers' original order.  *See, e.g.*, Figure 4.

55.     Other consumers believed they ordered an additional risk-free trial for only $4.95 in shipping and handling costs.

56.     When consumers clicked the "COMPLETE CHECKOUT" button on this page, Defendants charged them for a second trial product. If consumers did not cancel within 14 days, Defendants would charge them for the full cost of the product and enroll them in a second negative option plan for an additional $92.53 per month.

**Defendants' Restrictive Cancellation and Refund Practices**

57.     Defendants' websites told consumers they could cancel their subscriptions by telephone or email.

58.     Many consumers attempted to cancel their enrollment in the subscription program through the telephone or email and to obtain a refund of Defendants' unauthorized charges, but had difficulty doing so.

59.     Consumers who called Defendants to cancel the trial and subscription service often had difficulty reaching Defendants' customer service representatives, despite calling numerous times.

60.     In some instances, the customer service representatives said a supervisor would call them back, but no one ever did.

61.     In other instances, the customer service representatives refused to give any information to consumers and then yelled at them and hung up.

62.     Many consumers complained that Defendants' customer service representatives spoke only Spanish, or that the automated system they reached was only in Spanish.

63.     In some instances, consumers cancelled the trial via email or telephone within the 14- or 15-day trial period, but Defendants still charged them for the full price of the trial product.

64.     Sometimes, even when consumers canceled via email or telephone within the 14- or 15-day trial period, Defendants denied them refunds.

65.     Some consumers who contacted Defendants received an automated response telling them they could cancel via telephone by agreeing to a partial payment, typically $38.71. Many consumers agreed to this partial charge in order to cancel.  In other instances, consumers reached customer service representatives and obtained confirmations of cancellations, but Defendants continued to charge them.

66.     Some consumers cancelled via email, but despite receiving emails confirming the cancellations, Defendants continued to charge them.

67.     In many instances, consumers who sent back the trial product unopened in order to cancel or obtain a refund—as directed by Defendants' agent—were nevertheless refused cancellation and a refund, with Defendants' customer service representative telling them that Defendants never received the return shipment.

68.     Many consumers complained that Defendants' customer service representatives could not find any records of their purchases and orders.

69.     For consumers who successfully cancelled the initial trial, Defendants continued to charge them for the undisclosed upsell trial product.  Without telling consumers, Defendants required consumers to cancel those upsell trials and resulting autoship programs separately.

## DEFENDANTS EVADED DETECTION THROUGH A MAZE OF LLCs, CREDIT CARD LAUNDERING, AND FAKE WEBSITES

70.     Defendant Pai lied to payment processing entities and banks about who owned his LLCs in order to acquire merchant accounts needed to process credit and debit card sales from his product websites.

71.     In merchant applications, Pai identified other individuals as the owners of the LLCs he in fact owned and controlled.

72.     By doing so, Pai shielded himself from consumer complaints and chargeback disputes related to sales processed through his LLCs' merchant accounts, thereby evading detection from consumers, financial institutions, and law enforcement.

### Defendants Laundered Transactions
### Through Hundreds of Their Shell Companies' Merchant Accounts

73.     Defendants obtained hundreds of merchant accounts in the name of over 100 LLCs by submitting falsified information to payment processing entities.  These LLCs included Defendants Ace Initiative Group, Connected Ad Station, Fastlane Sales, Hyper Marketing, Media Redefined, Primed Marketing, and Responsive Media.

74.     Merchant account applications for Pai's LLCs identified over 100 different individual owners including Sarina Sepulveda, Ambrel Dunstan, James Ivester, Kathryn Vanderpool, Derek Vanderpool, Tracy Jeffry, and Darrell Jeffrey.

75.     Defendant Pai solely owned and controlled these companies.  Pai also controlled these companies' business bank accounts ("depository accounts").

76.     These LLCs did not conduct any business other than debiting consumers' credit cards and financial accounts.

77.      Defendant Pai, directly or through agents acting on his behalf and for his benefit, submitted hundreds of merchant account applications in the name of these LLCs to multiple payment processing entities to obtain merchant accounts.

78.     The applications listed individuals other than Pai as 100% owners of the LLCs. Over 100 such individuals appeared on these merchant applications.

79.     When applying for a merchant account, merchants often submit copies of their IRS Form SS-4 notices assigning businesses employer identification numbers ("EINs").

80.     Defendant Pai, directly or through agents acting on his behalf and for his benefit, submitted EINs with the LLCs' merchant applications.

81.     Pai altered the EINs showing that he owned the companies before submitting them as part of a merchant account application.  He changed the EINs to make it appear as though the individuals identified on the merchant applications owned the companies.

82.     Figure 5 shows a snapshot of the EIN for Defendant Media Redefined.  Defendant Pai submitted this EIN to Capital One bank.  The EIN identifies Defendant Pai as the sole member of the LLC and includes Pai's address.  The EIN is dated 11-06-2015.



Figure 5 (Media Redefined EIN submitted to Capital One).

83.     Figure 6 shows a snapshot of the "same" EIN that Defendants submitted with a Media Redefined merchant application to a merchant processor.   The EIN now identifies Derek Vanderpool as a member of the LLC.  Derek Vanderpool's name and address appear where Pai's name appeared on the EIN submitted to Capital One.  This EIN is dated 11-06-2015.



Figure 6 (Media Redefined EIN submitted to a merchant processor).

84.     In many instances, merchant applications must include copies of business bank account statements and voided checks drawn from these depository accounts. Paymentprocessing entities use these documents to validate the depository accounts where the merchant will transfer the credit card and debit card sales revenue.

85.     Defendant Pai, directly or through agents acting on his behalf or for his benefit, submitted depository account statements and voided checks with the merchant applications.

86.     In numerous instances, Defendant Pai altered these bank statements and voided checks by changing the addresses identified on them from Defendant Pai's address to those of the individuals identified on the merchant applications.

87.     These alterations made it appear as though the individuals identified on the merchant applications controlled the depository accounts when in fact Pai did.

88.     Defendants secured hundreds of merchant accounts based on these merchant account applications.

89.     Payment processing entities approved the merchant applications, set up merchant accounts for each of the companies, and began processing payments through acquiring banks.

90.     Defendants then deposited the payments into depository accounts that Pai owned and controlled.

91.     After receiving processing payments through the merchant accounts, Defendant Pai transferred the revenues into the depository account for Defendant F9 Advertising.

92.     Defendants used F9 Advertising's bank accounts to operate the scheme and move money.  F9 Advertising made payments to affiliate networks and numerous other third-party vendors.

93.     F9 Advertising paid Defendant Pai's personal expenses, including his personal credit card bills and credit card bills in his parents' names.

94.     Between 2016 and 2017, Defendant Pai transferred over $7 million from the F9 Advertising bank accounts to his personal bank accounts.

95.     During this time, payment processors closed merchant accounts for at least 66 of Defendants' companies due to excessive chargebacks.

**Defendants Provided Fake "Clean" Websites with Their Merchant Applications**

96.     When applying for a merchant account for sales involving negative option features, merchants often must disclose the product website to payment processing entities so those entities can ensure that proper disclosures related to the sale are prominent to consumers.

97.      Defendants submitted websites with their merchant account applications that had prominent disclosures about the terms of the trials, including information about the autoship program and how to avoid incurring further charges ("clean websites").

98.     The Defendants did not process sales from these "clean" websites or sell the products identified on those sites.  For example, one of the "clean" websites identified the product Skin Ageless Today, a product Defendants did not sell.

99.     Moreover, as described above in Paragraphs 29-56, Defendants processed the actual sales from product websites with inadequate disclosures that were neither clear nor conspicuous.  *See* Figures 1-4.

100.    The "clean" websites provided to payment processer entities included checkout web pages with the trials' terms and conditions placed in close proximity to the box where consumers entered their credit card information.

101.    These websites explained that consumers had the option to cancel within a short period at no cost or to be charged the full price of the trial product and enrolled into a monthly subscription program with monthly billings.

102.    The checkout web pages for these websites included a box for consumers to check stating that they had agreed to the terms of the offer.

103.    For example, Defendant Ace Initiative Group submitted a merchant account application with the following checkout web page from its website:



Figure 7 (Ace Initiative Group's "clean" website order page submitted to a merchant processor).

104.    As alleged in Paragraph 39, the actual checkout pages tied to a sale by Defendant Ace Initiative Group omitted any information about additional charges tied to the trial offers.

Moreover, these checkout pages did not include a checkbox for consumers to check to show they had agreed to the terms and conditions.  *See* Figure 3.

105.    Moreover, merchant account applications for Defendant Ace Initiative Group claimed to be selling the skin product Skin Ageless Today.  Defendants, including Ace Initiative Group, did not sell this product.

106.    By obtaining hundreds of merchant accounts for hundreds of products they never sold, Defendants made it difficult for payment processing entities, consumers, and law enforcement to tie Defendants to the products they sold.

107.    Defendants sold each of their skin care products online for a few months at a time, typically three to four months.

108.    Selling each of their skin care products for a short time made detection of Defendants' fraud more difficult.

109.    By the time many consumers discovered the fraud and hidden charges related to their trial products and alerted their credit card companies or regulators, Defendants' websites for those products were often no longer operational and Defendants had moved on to selling another product using another shell company.

110.    The billing descriptors on consumers' credit card statements for charges related to Defendants' products showed the name of a product different from the product consumers ordered online.

111.    This tactic further shielded Defendants from discovery by creating confusion.

112.    Defendants challenged consumers' chargeback requests by submitting copies of their "clean" checkout web pages to the consumers' credit card companies.  *See* Figure 7.

## VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT

113.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401-8405, which became effective on December 29, 2010.  Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce.  To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business."  15 U.S.C. § 8401.

114.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges.  15 U.S.C. § 8403.

115.    The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer."  16 C.F.R. § 310.2(w).

116.    As described in Paragraphs 29-57, Defendants have advertised and sold skin care products through a negative option feature as defined by the TSR.  16 C.F.R. § 310.2(w).

117.    Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

## COUNT I

### Illegal Negative Option Marketing

118.     In numerous instances from 2016 to 2017, Defendants, as described in Paragraphs 20-69, in connection with charging consumers for skin care products sold in transactions on the Internet through a negative option feature, failed to:

a.     Clearly and conspicuously disclose all material terms of the transactions before obtaining the consumers' billing information.  Those material terms included: (i) the total cost of the transaction; (ii) that Defendants automatically enroll consumers in monthly negative option plans; (iii) that consumers must affirmatively cancel the trials within a short period to avoid charges; (iv) that consumers must affirmatively cancel the negative option plans to avoid charges; (v) that consumers who complete the transaction are purchasing two separate products with separate requirements to cancel within a short period of time to avoid further charge; and (vi) that consumers who complete the transaction will be enrolled in two separate monthly negative options plans with separate requirements to cancel to avoid further charges;

b.     Obtain consumers' express informed consent before charging the consumers' credit cards, debit cards, bank accounts, or other financial accounts for products or services through such transactions; and

c.     Provide simple mechanisms for a consumer to stop recurring charges for products to the consumer's credit card, debit card, bank account, or other financial account.

119.     Defendants' acts or practices, as alleged in Paragraph 118, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

120.    Consumers have suffered substantial injury because of Defendants' violations of ROSCA.  In addition, Defendants have been unjustly enriched because of their unlawful acts or practices.   Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

121.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404, authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies.

## PRAYER FOR RELIEF

122.    Wherefore, Plaintiff FTC, pursuant to Section 19 of the FTC Act, 15 U.S.C. § 57b, Section 5 of ROSCA, 15 U.S.C. § 8404, and the Court's own equitable powers, requests that the Court:

A.    Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of ROSCA, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and disgorgement of ill-gotten monies;

B.    Enter a permanent injunction to prevent future violations of ROSCA by Defendants; and

C.    Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

24

Respectfully submitted this 21st day of February 2019.


Alden F. Abbott
General Counsel


/s/ Gregory Madden
GREGORY MADDEN (G02909)
MICHELLE SCHAEFER (G02910)
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20580
Mail Drop CC-9528
(202) 326-2416 (Madden Tel.)
(202) 326-3515 (Schaefer Tel.)
(202) 326-3197 (Fax)
gmadden@ftc.gov
mschaefer@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION